BOWLES, Price Administrator, v.
LENTIN.

No. 8788.

Circuit Court of Appeals, Seventh Circuit.

Nov. 9, 1945.

As Corrected Nov. 16, 1945.

Rehearing Denied Dec. 5, 1945.

Henry H. Koven, of Chicago, Ill. (Louis E. Levinson, of Chicago, Ill., of counsel), for appellant.

Fleming James, Jr., Office of Price Administration, of Washington, D. C., Harry E. Witherell, of Chicago, Ill., and Abraham H. Maller, George Moncharch, Deputy Adm'r for Enforcement, David London, Chief Appellate Branch, and A. M. Dreyer, Atty., Office of Price Administration, all of Washington, D. C., Amos J. Coffman, Regional Atty, of Dallas, Tex., and George E. Leonard and Randal Elmer, Attys., Office of Price Administration, both of Chicago, Ill., for appellee.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Defendant appeals from a judgment awarding plaintiff damages under § 205(e) of the Emergency Price Control Act, 50 U.S.C.A.Appendix § 925(e), and an injunction enjoining defendant from any further violations of the lumber regulations adopted by the Price Administrator.

In plaintiff's complaint defendant was charged with having knowingly and wilfully purchased and sold lumber at prices in excess of the maximum prices prescribed by the Price Schedules. Defendant denied the charges and questioned the propriety of issuing an injunction.

The applicable price regulations are Maximum Price Regulation 94,* as amended, 7 Fed.Reg. 10848, and 458, as amended, 8 Fed.Reg. 11736 (hereinafter referred to as MPR94 and MPR458).

*Mexican Ponderosa Pine.* There is no claim that the lumber was improperly priced under the regulation. In fact, no such claim could be made since that is a matter within the exclusive jurisdiction of the Emergency Court of Appeals, § 204(d), Emergency Price Control Act, 50 U.S.C.A. Appendix, § 924(d), and Yakus v. United States, 321 U.S. 414, 429, 64 S.Ct. 660, 88 L.Ed. 834.

The record reveals that from December 29, 1942, defendant, with his place of business in Chicago, Illinois, has been engaged in the business of buying and selling western pine and associated species of lumber and oak flooring, and that during the period in question, October 20, 1943, to April 27, 1944, he purchased from the Pan-American Trading Company of Kansas City, Missouri, 28 carloads of Mexican Ponderosa pine, in widths and lengths well assorted between 10' and 20', at $63.00 per 1,000 board feet. In his order for the purchase of this lumber there were no specifications concerning the percent of the various lengths to be furnished. This lumber defendant sold and delivered to purchasers for use or consumption in the usual course of trade or business, and the payment received therefor exceeded the applicable maximum price by $22,588.84. The invoices rendered by defendant to his customers purchasing the lumber designated the lumber as common No. 3, indicating, according to the trade practices of the lumber industry, that the lumber described in the invoices was predominately No. 3, but other and better grades of lumber were included; that is to say, No. 3 and better is a combination grade. The applicable regulation of prices for No. 3 Common Board pine is Table 3, § 1381.513 Appendix A, MPR 94. It covers common boards of Ponderosa pine and includes five numerical types which are graded Nos. 1 to 5. § 1381.506(d), MPR94. It defines the method of invoicing combination grades: "Lumber sold on combination grades may not be sold at above the maximum price for the lowest grade actually named in the combination." The combination grades described in defendant's invoice showed a ceiling price of as much as $14 less than the $63 per 1,000 board feet at which the pine was purchased.

The trial judge made special findings of fact upon which he stated his conclusions of law. In his findings he found that the defendant on divers dates from October 20, 1943, had purchased and sold lumber at

---

* The pertinent provisions of MPR94 are as follows: "§ 1381.501 *Sales of Western pine and associated species of lumber at higher than maximum prices prohibited.* (a) On and after December 29, 1942, regardless of any contract or other obligation, no person shall sell or deliver, and no person shall buy or receive in the course of trade or business, any Western pine and associated species of lumber for direct-mill shipment at prices higher than the maximum prices fixed by this regulation, and no person shall agree, offer or attempt to do any of these things. Maximum f. o. b. mill prices are set forth in Appendices A to H.

"(b) Prices lower than the maximum prices may, of course, be charged and paid.

"§ 1381.506 *Prohibited practices*—(a) *General.* * * *

"(b) *Specific practices.* The following are among the specific practices prohibited:
* * * * * * * *

"(3) Selling as specified lengths or widths a shipment of lumber which is substantially equivalent to random lengths or widths; or reselling as specified lengths or widths a shipment bought by the seller as random lengths or widths.
* * * * * * * *

"(d) *Combination grades.* Lumber sold on combination grades may not be sold at above the maximum price for the lowest grade actually named in the combination. For example, the maximum price for No. 2 common and better is that set for No. 2 common. Of course, the amount of the different grades included can be quoted and shown separately on the invoice at the individual prices for those grades. Also, it is permissible to sell on the basis of a stated percentage of better grades, such as No. 2 with 15% No. 1. In this case the price of 15% of the footage may be the No. 1 price, if the invoice shows that the footage tally of the lumber actually shipped runs at least 15% No. 1. It is also permissible to quote a grade at that grade's price, with higher grades developing to be included at the grade differential. For example, when a seller quotes No. 2 at the No. 2 price, with No. 1 developing to be included at the No. 1 price, this is proper, since no actual dollars-and-cents quotation above the No. 2 price is made. Again, the final price must be based on actual tally. Note, however, that it is a violation to insist on the buyer's taking grades he does not want in order to get the grade he does want."

prices in excess of the maximum prices established therefor under MPR94, as amended; that the sales made by him were not made to purchasers for use or consumption other than in the course of trade or business, but were made to retailers or wholesalers; that these sales and purchases, at prices in excess of the maximum prices, were knowingly and wilfully made by defendant, and were known by him at the time to be in violation of the applicable regulations; that the testimony of defendant with respect to his purchases and sales of lumber was otherwise false in material respects; and that the amount by which the prices received by defendant exceeded the applicable maximum prices therefor was $22,832.97. (This sum includes $244.13 involved in the sale of oak flooring, presently to be discussed.) Upon these facts he concluded that the purchases and sales of lumber in excess of the applicable maximum prices constituted violations of the mentioned regulations and of the Emergency Price Control Act of 1942, and that plaintiff was entitled to an injunction and to a judgment for $45,665.94.

At the outset, we are met with the contention that plaintiff was estopped from recovering any damages because of statements appearing in a press release issued by the Office of Price Administration and because of oral statements alleged to have been made to defendant by an employee of plaintiff.

■ The publication relied upon affords no solace to defendant. It is a press release dated September 20, 1943, and while it states, "There are no price ceilings on the purchase of Mexican pine lumber outside the United States," the context is that Defense Supplies Corporation, a subsidiary of Reconstruction Finance Corporation, is authorized to sell only to Government procurement agencies. It is worthy of note that defendant did not buy this lumber in Mexico or outside the United States. He purchased it from Pan-American, f.o.b. El Paso, Texas. Not even the most generous interpretation could bring defendant within the cloak of such an authorization.

■ As to the oral statements, it is claimed that before defendant purchased the lumber from Pan-American he made telephonic inquiries of one Huntley, an employee in the Office of Price Administration, if the purchase could be made at the quoted price, and that he was told it was permissible. Huntley, however, denied having any conversation with defendant about Mexican Ponderosa pine. Under such circumstances, it is the function of the trial court to weigh the evidence and decide which of two witnesses is telling the truth. The court preferred to credit Huntley's testimony. In such a situation, when there are conflicts in the evidence which cannot be reconciled, it is our duty to accept the conclusion of the trial judge. Especially is this so where the court found as a fact that defendant's testimony was false in material respects. Moreover, we have already concurred in the view that the Administrator cannot be bound by oral interpretations of his employees which are contrary to official published regulations. Bowles v. Indianapolis Glove Co., 7 Cir., 150 F.2d 597, 601.

■ It is next contended that defendant was a mere broker or factor. To be sure, under § 205(e) which relates to enforcement of the Act, sellers alone are made subject to the provisions of damages. But § 205(e) does not purport to list the types of persons covered by the Act. It provides the measure of damages and steps to be taken by the Administrator should the buyer of an above the maximum-priced commodity fail to institute action. An examination of the entire Act fails to produce a list of the types of persons covered. It is necessary to look elsewhere, and MPR94, which establishes the maximum price for Ponderosa pine, does enumerate the persons covered. Section 1381.502(3) (c), MPR94 states: "Any person who makes the kind of sale or purchase, or who acts as broker in a sale covered by this regulation, is subject to it." Since the record discloses that defendant was engaged in the lumber business as a wholesale distributor, that Pan-American sold and defendant purchased the lumber, and that he in turn sold it to his customers, we are unable to see any merit in this contention.

It is claimed that some of the overcharges were not adequately proved.

Plaintiff's original complaint charged that 19 carloads of pine were purchased and sold in violation of the regulation. During the trial plaintiff established that defendant had purchased and sold 9 additional carloads, and to include these the complaint was amended. The 19 cars were sold for $63 per 1,000 board feet. Defendant testified that he sold every carload received exactly the same way as the 19 carloads. No claim is made that the over-

charges for the 19 carloads were not correctly computed at $16,126.36. Defendant was allowed the presumption that all the cars were sold as carloads and the divisor used by the court to compute the overcharges on the 9 cars was $63 per 1,000 board feet, and thus the overcharges were computed at $6,462.48. Now, defendant insists that plaintiff was required to prove his right to damages to a certainty, and that damages may not be assessed by a "conjectural method." He argues that since there was no proof of the amount of lumber in the 9 cars, the grade or grades, lengths, widths, etc., "it is impossible to ascertain the amount of overcharges by merely using the ratio of 9 cars to 19 cars."

■ True, the measure adopted by the court was not an exact measure, but it was not conjectural, and since the right to the damages was proved, it was not necessary to apply a scale as exacting as a screw-gauge. Especially is this so when the court has the discretion to render judgment for three times the amount of the single overcharge, and the judgment that the court rendered in the instant case is within the amount of the damages, concerning which there is no dispute. In our opinion the method employed in the instant case was a reasonable basis of computation. That was all that was required. Rynveld v. Dupuis, 5 Cir., 39 F.2d 399, and Roseland v. Phister Mfg. Co., 7 Cir., 125 F.2d 417, 139 A.L.R. 1013. Moreover, the defendant could have, had he desired to, produced his invoices on these cars and thus have eliminated all questions of inaccuracy. That he failed to do so leads to the conclusion that to produce the invoices would be inexpedient and raises the inference that· such evidence would have been unfavorable to him. Interstate Circuit, Inc., v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610, and Goldie v. Cox, 8 Cir., 130 F.2d 695.

Defendant next makes the point that the court failed to give him credit for an· item of $2 per 1,000 board feet instead of the $1 allowed, because the cars contained 18 and 20 foot lengths. He points to Table 3, § 1381.513, MPR94, Footnote 3(B) (1), "Specified lengths: 8″ and wider, 8′, 10′, 12′, 18′, and 20′, add $2.00." The court was of the opinion that Footnote 3(B) (2), "Specified lengths: For restricted random lengths 10′ to 16′, in 4/4 thickness only, add $1.00," applied.

If such a defense were sound, the defendant's purchases .would still be over the ceiling but he would be entitled to a reduction in damages. An examination of defendant's order to Pan-American discloses that the order called for "lengths to be well assorted and to be between 10′ and longer." As we have already noted, there were no specifications concerning the percent of the various lengths to be furnished, except as 10′ and longer might indirectly refer to them. Defendant tacitly admits that he was dealing with random lengths because he stated that with one exception he charged the same for the entire shipment; hence he made no distinction between lengths. He argues, however, that the invoices from Pan-American and the invoices to his purchasers mentioned the number of pieces ·of lumber, the widths and thickness, and that the 16, 18, and 20 foot lengths w.ere specified.

■ Even so, the meaning of "random" as used in the regulation means, we think,. lengths which are not determined or specified by the purchaser, but which are supplied by the seller at his discretion ·or at random. It means various lengths. Specified lengths would be the designation by the purchaser of certain enumerated lengths.

■ Defendant next contends that the court erred in refusing to permit him to introduce evidence showing that the actual grade of the pine was higher than No. 3 and better, as invoiced, and that he had distribution yards available. The argument is that the admission of such evidence would prove lack of wilfulness. With this we cannot agree.

Section 1381.505, MPR94, in describing the maximum requisites of an invoice, states: "Failure to invoice properly is just as much a violation of this Regulation as charging an excessive price"; hence, the admission ·of evidence that defendant and his customers knew the lumber was of a higher grade than appeared on the invoices would not indicate lack of wilfulness.

■ As for the exclusion of the evidence regarding distribution yard facilities, the argument, in effect, is that although he did not utilize his yard facilities for less than carload shipments, he would have, had not the pressure of the market made it unnecessary. The relevancy of this contention is understood from § 1381.502, MPR94,

which states that the regulation "does not apply to sales out of distribution yard stock." " * * * A sale is considered a sale out of distribution yard stock only if the lumber was a part of regular yard stock at the time the sale was made." Defendant concedes he made no use of his yards, nor in the light of the regulation was there any need for him to use them; hence, it is difficult to see the cogency of the evidence had it been admitted.

Another contention made by defendant is that the court erred in granting more than single damages. This contention is based on the hypothesis that he proved the partial defense provided for in the June 30, 1944 amendment to the Act. Section 205(e), 50 U.S.C.A.Appendix, § 925(e). By this amendment it became permissible for the court to consider elements of defendant's lack of wilfulness to violate applicable price regulations and whether he failed to take practicable precautions to avoid violations.

In support of this contention, counsel calls our attention to defendant's testimony relating to the claimed conversation with Huntley heretofore discussed.

We have already observed that the court chose to believe Huntley in preference to defendant, and found that the purchases and sales of the lumber were knowingly and wilfully made. This finding must stand unless we can say that it was clearly erroneous. This we cannot say, and since this court has held that the trial judge has unlimited discretion to render judgment for three times the amount of the single overcharge, Bowles v. Krodel, 7 Cir., 149 F.2d 398, we would not be warranted in saying the court erred in granting more than single damages.

*Oak Flooring.* The court found that defendant had violated the maximum price established by MPR458 in the amount of $244.13. This was predicated upon a one car shipment of oak flooring which was sold in less than carload lots. Defendant offers little in defense of the violation. He does urge, however, that it was error for the court to refuse to allow him to prove that he had yard storing facilities. Defendant apparently has confused MPR94 with MPR458. Under § 1381.502, MPR94, sales out of distribution yard stocks are excluded from the regulation. There is no indication that this is true under MPR458,

and the defendant makes no claim that the oak flooring was sold from a lumber yard.

Defendant also contends that the court was not justified in granting a permanent injunction without proof of possible future violations.

The granting of an injunction under the Act lies within the trial court's discretion. Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754. While it is true that the injunction is not to be used to punish past offenses, but is to be used only in a proper case to prevent wrongdoing in the future, yet the question is whether the court, having discretion to grant or refuse the injunction, abused its discretion. Bowles v. Montgomery Ward & Co., 7 Cir., 143 F.2d 38. The court therefore had the discretion of determining from defendant's conduct and attitude whether the offenses would be repeated. In the exercise of that discretion, he could consider the past as a key for the future. This he did. In the light of the findings in this case, we cannot say the court abused its discretion.

Finally, defendant insists that the court's characterization of the defendant as guilty of every dodge to escape liability and of the case as one of the worst examples of violations of OPA regulations, indicates bias and prejudice and stamps the trial as unfair.

The court's remarks, apparently predicated upon defendant's conduct in concealing the purchase and sale of the 9 additional cars, were made at the close of all the evidence during the closing argument of defendant's counsel.

In the absence of a jury, the court has wide latitude in commenting upon the occurrences at the trial, and the disposition of courts to reverse judgments because of minor excesses in the exercise of the judge's authority at the trial has much abated, United States v. Warren, 2 Cir., 120 F.2d 211, and we must guard against the magnification on appeal of instances which are of little importance in their setting. Glasser v. United States, 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680. It is conceivable that, even in a trial before a judge without a jury, the conduct of the judge might be so unfair as to give rise to sufficient inference of a prejudice in his findings to warrant a reversal of a judgment entered by him. National Labor Re-

lations Board v. Air Associates, 2 Cir., 121 F.2d 586. However, under the circumstances here appearing, the remarks of the court did not constitute bias or prejudice warranting a reversal.

The judgment of the District Court will be affirmed. It is so ordered.